UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

EVERBANK, etc.,

    Plaintiff,

    v.                           Case No.3:10-cv-1175-J-12TEM

FIFTH THIRD BANK, etc.,

    Defendant.

## O R D E R

This cause is before the Court on three motions for partial or summary judgment filed by Defendant (Docs. 41, 42 and 43), with exhibits in support attached and filed separately (Docs. 44-46), all filed on April 2, 2012. Plaintiff's responses thereto (Docs. 49, 50 and 51) with attached exhibits, were filed April 18, 2012, and Defendant's replies (Docs. 54, 55 and 56) were filed on May 4, 2012. On June 13, 2012, the Court conducted a hearing on the motions.[1] For the reasons set forth below, the Court will deny each of Defendant's motions.

### Summary Judgment Standard

Summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to

---

    [1]      At the commencement of the hearing, the Court noted that neither Fed.R.Civ.P. 56 nor Local Rule 3.01 appear to authorize the filing of three separate motions for partial or summary judgment. Nevertheless, because Plaintiff had not objected until the Court raised the issue at the hearing, and had in fact consented to the filing of reply memoranda by Defendant, the Court found that there had been no prejudice to Plaintiff, permitted the motions to remain as filed, and proceeded with the hearing.

any material fact and that the movant is entitled to a judgment as a matter of law."

Fed.R.Civ.P. 56(c).  The Court's task is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986). The purpose of summary judgment is to dispose of unsupported claims or defenses which, as a matter of law, do not raise issues of material fact suitable for trial. Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). In determining whether the movant is entitled to summary judgment, the Court must view all the evidence and factual inferences reasonably drawn from the evidence in the light most favorable to the non-moving party, and must resolve all reasonable doubts in favor of the non-movant. See, e.g., Rioux v. City of Atlanta, Georgia, 520 F.3d 1269, 1274 (11th Cir. 2008)(citations omitted).

## Facts and Analysis

Plaintiff's Amended Complaint (Doc. 15) asserts two counts for breach of contract concerning agreements to service and purchase residential mortgage loans.  On December 15, 2006, Plaintiff and Defendant's predecessor in interest entered into Agreement for Purchase and Sale of Servicing ("Servicing Rights Agreement"), Doc. 15 at Exh. A, providing that Plaintiff would purchase the servicing rights and obligations to certain residential mortgage loans from Defendant's predecessor in interest. On February 12, 2007, the same parties entered into  Mortgage Loan Purchase and Warranties Agreement ("Purchase Agreement"), Doc. 15 at Exh. B, providing that Plaintiff would purchase various residential mortgage loans.

Both the Servicing Rights Agreement and the Purchase Agreement contain provisions requiring the Seller [now Defendant] to either indemnify the Purchaser [Plaintiff]

2

for losses, or to repurchase loans, if any loan is proven to be defective in any way, for example by not conforming to certain defined loan, borrower, property and other underwriting standards. In Count I, Plaintiff's Amended Complaint lists the various loans and alleged defects relating to the Servicing Rights Agreement, that Plaintiff claims either are due to be repurchased (Group 1A loans) or for which indemnity allegedly is owed (Group 1B loans). With respect to the Purchase Agreement, Count II sets out the various loans (without the alleged defects), that Plaintiff claims either are due to be repurchased (Group 2A loans) or for which indemnity allegedly is owed (Group 2B loans). In Count I, Plaintiff claims Defendant breached the Servicing Rights Agreement by violating representations, warranties, and obligations with respect to these loans and by failing to repurchase loans and pay money owed to Plaintiff. Count II makes similar allegations with regard to Defendant's alleged breach of the Purchase Agreement.

Defendant seeks partial summary judgment on two issues with regard to Count I: 1) payment due under the Holdback provision of the Servicing Rights Agreement ("First Motion for Partial Summary Judgment as to Count I"); and 2) the alleged unenforceability of a penalty provision ("Second Motion for Partial Summary Judgment as to Count I"). See Docs. 41 and 42. Defendant also seeks summary judgment on Count II on two grounds ("Motion for Summary Judgment as to Count II"). See Doc. 43. The Court will discuss the issues raised by each motion in turn.

### First Motion for Partial Summary Judgment as to Count I

"Defendant's Motion for Partial Summary Judgment Regarding Its Fourth Affirmative Defense of Prior Breach and Counterclaim for Breach of Contract" ("First Motion for Partial Summary Judgment as to Count I")(Doc. 41) seeks partial summary judgment on its

3

Affirmative Defense and Counter-claim (see Doc. 65) alleging that Plaintiff breached

Section 3.3(c) of the Servicing Rights Agreement, the Holdback provision, pursuant to

which Plaintiff/Purchaser held back 10% of the amount it owed Defendant/Seller for the

purchase of loan servicing rights pending the completion of certain contractual

requirements. The Holdback provision, Section 3.3(c), states:

> The balance of the Purchase Price, which is represented by the
> Holdback, shall be paid as herein provided:

(i) fifty percent (50%) of the Holdback shall be paid to the Seller upon
-completion of recertification of all Ginnie Mae Pools
-Seller's completion in all material respects of the delivery
requirements set forth in the Transfer Instructions and
-Purchaser's receipt of seventy-five percent (75%) of the Recorded
Assignments,

(ii) an additional twenty-five (25%) of the Holdback will be paid to Seller upon
Purchaser's receipt of ninety-five percent (95%) of the Recorded
Assignments, and

(iii) the balance of the Holdback will be paid to Seller upon Seller's
completion of all delivery requirements set forth in this agreement

At some point after Plaintiff initiated demands that Defendant repurchase some of

the loans it claimed were defective under the Servicing Rights Agreement, and Defendant

had repurchased some loans, Defendant demanded release of the Holdback amount which

was $1.75 million, representing 10% of purchase price for the group of loans, and ceased

processing any further requests by Plaintiff to repurchase loans.  In this First Motion for

Partial Summary Judgment as to Count I, Defendant claims that Plaintiff should have

released at least 25% of the Holdback amount ($437,500.00) when Plaintiff received 95%

of the Recorded Assignments.

Defendant acknowledges that material issues of disputed fact exist regarding

4

whether it completed all of the requirements set forth in Section 3.3(c)(i) for payment of 50% of the Holdback amount, particularly the completion in all material respects of the delivery requirements, which largely involved providing certain documents for each loan that were required to be furnished under the Servicing Rights Agreement, but allegedly were not provided. Nevertheless, Defendant cites the testimony of Plaintiff's corporate representative Carolyn Cragg to support its position that there is no dispute that Plaintiff received 95% of Recorded Assignments as required by Section 3.3(c)(ii), which it alleges was Plaintiff's sole basis for non-payment of the Holdback amount. Defendant maintains that the only reasonable interpretation of the Holdback provision is that Plaintiff should have released at least a portion of the Holdback amount when Plaintiff received 95% of the Recorded Assignments. Defendant asks the Court to find that it is entitled to partial summary judgment as to 25% of the Holdback amount.

In response, Plaintiff first asserts that the only evidence that 95% of Recorded Assignments were received by Plaintiff is a statement by Defendant's corporate representative that Plaintiff had not disputed that Defendant had fulfilled that requirement set out in Section 3.3(c)(ii). It next argues that fulfillment of all the requirements set forth in Section 3.3(c)(i) were essential to the agreement and a condition precedent before payment of the first 50%, or any part of the Holdback amount. As stated above, Defendant acknowledges that a dispute exists about whether all the requirements of Section 3.3(c)(i) were fulfilled, but claims that the only reasonable interpretation of the contract is that those requirements were not a condition precedent, so even with a dispute as to whether they were fulfilled, Defendant is still entitled to 25% of the Holdback amount because there is no dispute that Plaintiff received 95% of the Recorded Assignments.

5

Finally, Plaintiff maintains that Defendant's motion must be denied because the Servicing Rights Agreement provides another basis for withholding payment of the Holdback amount. Section 3.3(c) also states that:

> Notwithstanding the foregoing [3.3(c)(i)-(iii)] Purchaser [Plaintiff] may elect to withhold such portion of the Holdback as Purchaser determines, in good faith, is equivalent to the out-of-pocket damages and expenses it expects to sustain if any of Seller's [Defendant's] representations and warranties are found to be untrue in any material respect or if Seller has otherwise defaulted under the Agreement....

Plaintiff cites to record evidence that Defendant has admitted that Plaintiff's claimed damages resulting from Defendant's wrongful failure to repurchase loans are greater than the 25% of the Holdback amount, so this provision also allowed Plaintiff to withhold the entire Holdback amount.

Plaintiff's corporate representative, Carolyn Cragg, testified in her deposition that she made the decision not to release Holdback amounts after Defendant requested they be paid, due to Defendant's failure to provide some 7,100 documents in connection with the loans, and because there were five demands for loan repurchase outstanding. Doc. 44 at 69-70, 75-76. It was her opinion that the delivery requirements of Section 3.3(c)(i) had not been accomplished in all material respects, mainly the non-delivery of various documents needed because of Plaintiff's obligations to the investors of the loans they were to service, so no Holdback monies were owed. Id. at 77-78. She also testified that transfer of both 75% and 95% of the Recorded Assignments was accomplished. Id. at 79. Carolyn Cragg also stated that no calculation had been made as to Plaintiff's out-of-pocket expenses pursuant to the provision in Section 3.3(c) which allowed withholding of Holdback in the event of breach of the contract by Defendant, but that provision was referenced in

some correspondence to Defendant because of the outstanding repurchase demands to bring its attention to their obligation to repurchase. Id. at 82, 84-85, 88.

The Court carefully has reviewed the record submitted by the parties. Plaintiff has not identified, nor has the Court found, any evidence to contradict the reasonable reading of the testimony of Carolyn Cragg and Stephen Johnson, Defendant's corporate representative, (Doc. 49, Exh. 1 at 39) that Plaintiff received 95% of the Recorded Assignments. As a result, the Court must determine whether any questions of fact exist regarding whether the condition that Defendant complete in all material respects the delivery requirements was a prerequisite or condition precedent to payment of any part of the Holdback amount, or whether the provision permitting Plaintiff to withhold payment of Holdback monies it believed in good faith were equivalent to its out-of-pocket expenses upon Defendant's alleged breach of the Servicing Rights Agreement could serve as a basis for withholding of the Holdback amount.

The Court finds a question of fact exists regarding whether completion of the delivery requirements was a condition precedent to the payment of any part of the Holdback amount. Payment of 50% of the Holdback amount admittedly was conditioned upon the material completion of delivery requirements as set forth in Section3.3(c)(i). Section 3.3(c)(ii) provided for "**an additional** twenty-five 25%" of the Holback amount to be paid upon Plaintiff's receipt of 95% of the Recorded Assignments.   "[A]n additional" modifies "twenty-five percent 25%."   One reasonable, ordinary, reading of the contract language would suggest that its meaning was that the additional 25% percent was to be paid after the first 50% was paid, so all the conditions required for payment of the 50% would have to have been met first. Carolyn Cragg testified that it was her understanding

7

that fulfillment of the delivery requirements was a condition precedent to payback of any part of the Holdback amount and was the basis for her decision not to release any portion of it.

The record is not clear whether Defendant demanded payment of all or part of the Holdback amount believing that it had fulfilled all or some of the required conditions. Its demand for repayment of the Holdback Amount suggests that it maintained a different interpretation of Section 3.3(c). Defendant also argues that the phrase "an additional" modifies only the percentage of the Holdback amount due, but does not subject the release of 25% to all of the conditions required for release of 50% of the Holdback amount.

The Court reads Defendant's interpretation of the contract language as a more strained, but a possible one. Nevertheless, Plaintiff's interpretation also is possible, so Defendant is not entitled to summary judgment in its favor as to this issue.

The provision of Section 3.3(c) permitting Plaintiff to withhold payment of Holdback monies it believed in good faith were equivalent to its out-of-pocket expenses upon Defendant's alleged breach of the Servicing Rights Agreement potentially could have justified retention of the Holdback amount. Carolyn Cragg testified that Plaintiff had not attempted to calculate its out-of-pocket expenses and that the basis for non-payment of the Holdback amount was Defendant's alleged failure to complete the prerequisites for payment set forth in Section 3.3(c)(i). Nevertheless, two letters from other employees of Plaintiff indicate that this provision may have provided some basis for retaining the Holdback amount. A letter dated August 25, 2008, asserts Defendant's breach of the Servicing Rights Agreement, and indicates that Plaintiff's outstanding repurchase demands had a bearing on its decision regarding release of the Holdback amount. Doc. 50, Exh. 6.

8

Another letter dated March 2, 2009, refers to a number of loans Plaintiff had demanded

Defendant repurchase, and cites this contract provision in asserting that no Holdback

funds are due. Doc. 50, Exh. 7 at unnumbered 4. So a question of fact likewise exists

whether this provision was a basis for retention of the Holdback amount.

The Court finds that questions of fact preclude summary judgment on the issue of

Defendant's entitlement to receive 25% of the Holdback amount. The Court thus will deny

Defendant's First Motion for Partial Summary Judgment as to Count I.

### Second Motion for Partial Summary Judgment as to Count I

"Defendant, Fifth Third Bank's Motion for Partial Summary Judgment Regarding

Damages Award of Penalties" ("Second Motion for Partial Summary Judgment as to Count

I")(Doc. 42) seeks a determination that Section 12.2 of the Servicing Rights Agreement is

an unenforceable contract penalty under Florida law. It provides:

> If Seller [Defendant] fails for any reason to purchase or repurchase within the
> time period required under this Agreement, *an additional penalty* of
> $1,000.00 will be assessed for each additional fifteen (15) day period until
> such purchase or repurchase payment is received by Purchaser [Plaintiff].
> (Emphasis added).

Defendant maintains that Plaintiff should be barred from recovering such additional

penalties under the Servicing Rights Agreement because they are intended to be penalties

for breach of contract which are unenforceable under Florida law. Defendant's position is

that Section 12.2 was not meant to provide for the recovery of liquidated damages in lieu

of actual damages, because it also provides a method to calculate Plaintiff's actual

damage for Defendant's failure to repurchase as follows:

> The purchase price under this subparagraph for any repurchased Mortgage
> Loan shall equal the sum of (w)Purchase Price paid for such Mortgage Loan,
> (x) if the repurchase is of the Mortgage Loan as required herein, the

aggregate unpaid principal balance of the Mortgage Loan and all accrued and unpaid interest thereon at the time of repurchase by the Seller [Defendant], (y) all sums paid by Purchaser [Plaintiff] as to such Mortgage Loan for the related Accounts Receivables to the extent Purchaser has not been reimbursed for such Accounts Receivables by the respective Mortgagors or otherwise, and (z) all other unreimbursed costs, expenses and advances incurred by Purchaser in connection with such Mortgage Loan after the Transfer Date. (Emphasis added.)

Plaintiff asserts that despite its label as "additional penalty" in the Servicing Rights Agreement, and Plaintiff's reference to recovery of penalties in its Amended Complaint, this provision was intended to permit Plaintiff to recover liquidated damages upon Defendant's breach for incalculable damages resulting from ongoing breach of the agreement that were not included in the damage calculation formula.

Under Florida law, it is well-settled that parties may stipulate in advance to an amount of liquidated damages in the event of a breach. Lefemine v. Baron, 573 So.2d 326, 328 (Fla. 1991)(citations omitted)(because parties had option to choose between actual or liquidated damages, liquidated damage clause was an improper penalty). However,

A contract term which provides that a party must pay a penalty for breaching a contract in unenforceable.  A penalty is a sum named, which is disproportionate to the damages which could have been anticipated from breach of the contract, and which is agreed upon in order to enforce performance of the main purpose of the contract by the compulsion of this very disproportion.... If damages are readily ascertainable on the date of the contract, a stipulated damages clause is a penalty and unenforceable.... If they are not ascertainable the clause is for liquidated damages and is enforceable if the amount is not grossly disproportionate to the damages that might reasonably be expected to flow from the breach.

Crosby Forrest Products, Inc. v. Byers, 623 So.2d 565, 567 (Fla. 5th D.C.A. 1993)(citations omitted).

Courts use a two-part test to determine whether a purported liquidated damages

10

provision will be upheld.  First, the damages resulting from breach must not be readily

calculable.  Lefemine, 573 So.2d at 328.  Second, the agreed sum of liquidated damages

must not be so grossly disproportionate to any damages that might reasonably be

expected to result from the breach, which would indicate that  the parties intended such

damages only to induce performance of the contract, and not to liquidate their damages.

Id.  In determining whether a contract provision is one for liquidated damages or a penalty

for breach of contract, the Court should consider: 1) the reasonableness of the provision;

2) the certainty of establishing actual damages; and 3) the intent of the parties. T.A.S.

Heavy Equipment, Inc. v. Delint, Inc., 532 So.2d 23, 25 (Fla. 4th D.C.A. 1988).  The

important question is whether at the time the contract is executed, damages flowing from

breach are readily ascertainable.  Id.

> In addition,
>
> The name given by the parties to a sum stipulated to be paid upon the
> default of one of them is not at all conclusive as to the character of the
> stipulation. If it was the real intention of the parties, as ascertained from all
> the language which they have used, from the nature of the act to be
> performed, or not to be performed, from the consequences which naturally
> result from a violation of the contract, and from the circumstances generally
> surrounding the transaction, that the sum stipulated to be paid or forfeited
> was intended to be 'liquidated damages,' it will be so held, even though the
> parties may have designated it a 'penalty.'

Hyman v. Cohen, 73 So.2d 393, 398 (Fla. 1954)(citations omitted).  Normally, whether an

agreed sum agreed to be paid upon breach is a penalty or liquidated damages is a

question of law for the court, and when it is doubtful, the courts tend to construe a provision

for the payment of an arbitrary sum as a penalty, rather than one for liquidated damages.

T.A.S. Heavy Equipment, 532 So.2d at 25.  However, a triable issue of fact may be raised

11

regarding whether damages were ascertainable at the time of contracting in order to determine whether the provision serves as a true penalty clause or is a liquidated damages clause.  See Double AA International Investment v. Swire Pacific Holdings, Inc., 674 F.Supp.2d 1344, 1352-53 (S.D.Fla. 2009)(finding that triable of issue of fact was raised when both parties cited to the same deposition testimony in support of their respective positions).

In this case, Defendant's Second Motion for Partial Summary Judgment as to Count I requires the Court to determine whether the intent of parties was to induce performance of the Servicing Rights Agreement by providing a penalty for breach, or whether what was labeled a penalty was intended to stipulate to an amount of damages for breach of contract that were not readily ascertainable at the time the parties executed the contract, or whether questions of material fact preclude that determination.  The Court is of the opinion that a triable issue of fact exists in this case as to whether the total amount of Plaintiff's potential damages in the event of breach of the Servicing Rights Agreement by Defendant was readily ascertainable.  This finding precludes a determination on summary judgment whether Section 12.2 should be construed as a penalty provision or liquidated damages provision, and whether the amount sought as liquidated damages is grossly disproportionate to any conceivable actual damages.

Section 12.2 of the Servicing Rights Agreement undisputedly uses the term "additional penalty." The term "liquidated damages" does not appear in the agreement, nor in Plaintiff's Amended Complaint.  In its Amended Complaint, Plaintiff describes its damages as the amounts set forth with regard to each loan, "plus penalties, fees, additional accrued interest, *other amounts that are due and payable to [Plaintiff]* pursuant

12

to the Agreements, attorney's fees and costs of suit. Doc. 15 at ¶20 (emphasis added). Count I of the Amended Complaint alleging breach of the Servicing Rights Agreement does not specifically mention recovery of penalties or other amounts other than the repurchase and indemnity amounts specified in a previous paragraph, but those amounts as well as penalties and other amounts of damages are incorporated by reference. Doc. 15 at ¶¶ 22-27.

Defendant maintains that the repurchase price formula contained in Section 12.2 includes "all other unreimbursed costs, expenses and advances incurred" by Plaintiff, so it includes all of Plaintiff's actual damages for any failure to repurchase a loan as required. Defendant argues that as a result, "additional penalties" are in fact unenforceable penalties for breach and not intended as liquidated damages to compensate Plaintiff for damages which were not ascertainable at the time the parties signed the Servicing Rights Agreement. Defendant also argues that even if the Court were to find that the provision is one for liquidated damages, the amount of $1,000 every fifteen (15) days, or some $24,000 a year, per loan clearly is grossly excessive to any potential actual damages.

Plaintiff's position is that the repurchase price formula does not include all elements of Plaintiff's potential actual damages. Carolyn Cragg, Plaintiff's corporate representative, testified that the penalty provision was intended to be an amount of liquidated damages in addition to repurchase damages, to compensate Plaintiff for stepping in Defendant's shoes with the third party investor of the loan being serviced in the event of Defendant's ongoing breach of the Servicing Rights Agreement. Doc. 44 at 55-56 and 62. In an affidavit, she explains:

At the time the parties entered into the Servicing Agreement, and for a

13

variety of reasons, including that EverBank [Plainitff] was required by certain investors of the loans, as a condition to approve the transfer of the subject servicing rights, to assume the responsibilities and obligations to third parties when it purchased the servicing rights to the loans, there was no practicable way to determine the further damages that EverBank would suffer as a result of Fifth Third's failure to repurchase the loans as required by the Agreement.

Doc. 50, Exh. 8 at ¶ 6.

Carolyn Cragg also testified that she did not know how the amount of purported liquidated damages, $1000 per every 15 days, or some $24,000 per year, that Defendant was in breach by failing to repurchase loans  as required under the Servicing Rights Agreement, was determined.  Doc. 44 at 61.

The Court recognizes that the determination of whether a contract provision should be construed as a penalty or a liquidated damages provision is normally a question of law decided by the Court.  That is a close question in this case, especially given that the term "additional penalty" is used in the contract.  Nevertheless, the Court is of the opinion that Plaintiff has brought forth evidence in the testimony and affidavit of Carolyn Cragg, to raise a disputed issue of material fact with regard to whether the "additional penalty" in Section 12.2 was intended to punish Defendant in the event of a breach of the Servicing Rights Agreement, or whether it was intended to compensate Plaintiff for additional damages for ongoing breach unascertainable at the time the parties entered the contract.

In addition, based on the evidence before it, the Court simply cannot make a determination that the amount of the purported liquidated damages is so grossly disproportionate to any damages that might reasonably be expected to result from Defendant's ongoing breach that the provision indicates that  the parties intended such damages only to induce performance of the contract and not to liquidate damages.  For

14

example, the Court notes that the repurchase amounts for the twenty-eight (28) Group 1A loans identified in the Amended Complaint, those loans Plaintiff claims must be repurchased by Defendant under the terms of the Servicing Rights Agreement, range from $12,347.04 to $262,846.81. A basis for finding the purported liquidated damage amount of $1,000 for every 15 days the loan is not repurchased as required by the Servicing Rights Agreement disproportionate is much stronger if every loan repurchase amount was similar. However, the loan amounts vary widely within the range noted above. On the basis of the record before it, the Court cannot make a determination as a matter of law that the purported liquidated damages amount is grossly disproportionate for the entire group of loans with such varying repurchase amounts at issue.

The Court finds that the testimony and other evidence in the record reveal disputed issues of fact about whether all of Plaintiff's actual damages in the event breach of the Servicing Rights Agreement by Defendant were ascertainable at the time that the parties entered into the Servicing Rights Agreement, which precludes a determination on summary judgment as to whether the parties intended Section 12.2 to impose a penalty for breach of contract or to permit the recovery of liquidated damages. Nor can the Court conclude as a matter of law that the purported liquidated damages amount was grossly disproportionate to any possible actual damages. As a result, the Court will deny Defendant's Second Motion for Partial Summary Judgment as to Count I.

### Motion for Summary Judgment as to Count II

"Fifth Third Bank's [Defendant's] Motion for Summary Judgment on Count 2" (Doc. 43)("Motion for Summary Judgment as to Count II") seeks summary judgment on two grounds. The Court will address each in turn.

15

First, with respect to the Group 2A loans identified in Plaintiff's Amended Complaint, Defendant asserts that Plaintiff improperly has sought repurchase damages, because Section 8.03 of the Purchase Agreement limits Plaintiff's remedy to the specific performance of repurchase. Defendant asserts that because Plaintiff seeks damages for breach of contract instead of the specific performance of repurchase, Plaintiff is not entitled to recover anything with regard to the Group 2A loans identified in Count II.

The Court is of the opinion that a fair and reasonable reading of Plaintiff's Amended Complaint, in light of the relevant Purchase Agreement provisions, leads to the conclusion that Plaintiff properly seeks remedies to which it may be entitled. Plaintiff's Amended Complaint describes Group 2A loans as loans relating to the Purchase Agreement which "must be repurchased." Doc. 15 at ¶ 14. It also alleges that Defendant breached the Purchase Agreement "by failing to repurchase the Loans by paying the required monies" to Plaintiff, and that Plaintiff has been damaged by Defendant's failure to pay repurchase and indemnity monies. Id. at ¶¶ 32 and 33. Plaintiff's corporate representative, Carolyn Cragg, testified in her deposition that the loans identified in the Amended Complaint as repurchase loans are loans that Plaintiff is demanding Defendant buy back and that repurchased loans would "go back" to Defendant upon repurchase. Doc. 44 at 17 and 98.

Section 8.02 of the Purchase Agreement provides that cure, substitution, or repurchase are the sole remedies available for Plaintiff in the event of breach of the various representations and warranties contained in the agreement. Doc. 1-1 at 24. Section 1 of the Purchase Agreement also defines the "Repurchase Price" that Defendant must pay in that event. Doc. 1-1 at 11. The remedy of repurchase as set forth in the Purchase Agreement entails the payment of monies (Repurchase Price as defined) to compensate

16

Plaintiff in the event of breach of the contract by Defendant, and return of the loan to Defendant.

In light of the foregoing, particularly at this stage of the proceedings in this case, the Court finds that Plaintiff's Amended Complaint must be read to request the remedy of repurchase of the Group 2A loans by Defendant at the Repurchase Price defined in the Repurchase Agreement. While perhaps the Amended Complaint could be more clearly worded, the Court cannot read it, as Defendant urges, to request damages only (and retention of the loans) in lieu of the specific performance of repurchase, which necessarily would entail payment of the Repurchase Price as defined in the Repurchase Agreement. Defendant has not established its entitlement to summary judgment as to Plaintiff's claims regarding Group 2A loans on this ground.

Defendant's second basis for summary judgment on Count II is that with respect to the Group 2B loans for which Plaintiff is seeking indemnification, Plaintiff has not established that its losses as to those loans were materially and adversely affected by any alleged misrepresentations by Defendant, as required by Section 8.06 of the Purchase Agreement.

The Court likewise does not find this ground persuasive.

Section 8.06 limits the scope of indemnification damages stating:

...the Seller [Defendant] shall only be obligated to indemnify Purchaser [Plaintiff] for Losses for a breach of a representation and warranty to the extent that such breach of representation or warranty materially and adversely affects the value of the Mortgage Loans or the Interest of the Purchaser therein [or the value of the loan or Purchaser's Interest as to any particular loan.]

Doc. 1-1 at 25. Plaintiff's right to indemnity under this provision is conditioned upon a

17

material and adverse effect of any breach of representation or warranty by Defendant on either the value of the loans sold or of any particular loan, or on the value of Plaintiff's interest therein.

The record before the Court contains evidence from Defendant's own corporate representative that at least some of the loans Defendant sold were poorly underwritten and likely subject to repurchase.  For example, Susan Parrett, a corporate representative for Defendant, testified that she had determined to recommend that a number of loans be repurchased by Defendant based on her recommendation that she could not defend the underwriting issues that were involved with the loans.  Doc. 51, Exh. 2 at 69, 150-52, and 237.

Plaintiff's corporate representative Ruth Owen stated in an affidavit that Defendant's representations and warranties regarding loans purchased provided a basis upon which Plaintiff depended in order to value the underlying loan, the risk associated with purchasing it, and the ability to resell loans to an investor.  Doc. 51, Exh. 1 at ¶¶ 13-19.  She also indicated that Plaintiff initially had demanded repurchase of all the loans at issue in this case because of breaches with respect to the representations and warranties.

Defendant correctly points out that the record does not contain evidence of the alleged effect any breaches by Defendant with regard to the loans had in terms of a precise monetary value.  That said, based on the foregoing, the record contains evidence to support Plaintiff's allegations that Defendant breached warranties and representations with respect to some of the loans at issue and that its interests in those loans was materially and adversely affected. Defendant has not established entitlement to summary judgment in its favor with respect to the Group 2B loans on this ground.

For the foregoing reasons, the Court will deny Defendant's Motion for Summary Judgment as to Count II.

## Conclusion

For the reasons set forth above, the Court finds that genuine issues of material fact exist regarding all of the issues for which Defendant seeks partial or summary judgment. Therefore all three of Defendant's motions (Docs. 41, 42 and 43) will be denied.

This case is now ready to be scheduled for a final pretrial conference and trial. As indicated at the hearing on Defendant's motions, the Court will reassign this case to an active judge's docket for all further proceedings. However, before doing so, the Court will give the parties an opportunity to continue any settlement discussions in order to attempt to resolve the case before it is reassigned and further proceedings are scheduled.

Upon review of the matter, it is

**ORDERED AND ADJUDGED**:

1)      That "Defendant's Motion for Partial Summary Judgment Regarding Its Fourth Affirmative Defense of Prior Breach and Counterclaim for Breach of Contract" (Doc. 41) is denied;

2)      That "Defendant, Fifth Third Bank's Motion for Partial Summary Judgment Regarding Damages Award of Penalties" (Doc. 42) is denied;

3)      That "Fifth Third Bank's [Defendant's] Motion for Summary Judgment on Count 2" (Doc. 43) is denied; and

4)      That the parties shall have until September 10, 2012, to confer and determine whether further settlement discussions would be beneficial before the case is reassigned for all further proceedings, and to file a joint notice advising the Court whether settlement

19

discussions are proceeding, or whether the case is ready to be reassigned for all further

proceedings including a final pretrial conference and trial.

      **DONE AND ORDERED** this _____8th_____ day of  August 2012.

*Howell W. Melton*

**SENIOR UNITED STATES DISTRICT JUDGE**

c:     Counsel of Record